UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ACTORS FEDERAL CREDIT UNION,

                Plaintiff,

-v-

CUMIS INSURANCE SOCIETY, INC.,

                Defendant.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 17 2012

11 Civ. 2129 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

    Plaintiff, Actors Federal Credit Union ("Actors"), initiated the above-captioned action against Defendant CUMIS Insurance Society, Inc. ("CUMIS") alleging breach of contract and seeking both damages and declaratory relief. (Cmplt. ¶¶ 1-3) Actors alleges that CUMIS breached its contract by denying Actors' insurance claim for losses suffered as the result of fraud and theft by a third party, Mount Vernon Money Center ("MVMC"). (*Id.*) CUMIS moved for summary judgment on Actors' Complaint in its entirety, Dkt. # 22, asserting that Actors' loss is not covered under the terms of the Bond. For the reasons that follow, CUMIS' motion for summary judgment is DENIED in its entirety.

### I.   LEGAL STANDARD

    Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). For summary judgment purposes, a genuine issue exists if the evidence is such that a reasonable jury could decide in the non-moving party's favor. *Id.* In evaluating a motion for summary judgment, the Court is not to weigh the

1

evidence or to make credibility assessments. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

In a summary judgment setting, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted). "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citations omitted).

## II.   FACTS

The following facts are undisputed or are presented in the light most favorable to the non-moving party, Actors. Actors is a not-for-profit financial cooperative chartered under the Federal Credit Union Act, 12 U.S.C. §1751, *et seq.*, and CUMIS is an insurance company that provides property and casualty insurance to credit unions. (Cmplt. ¶¶ 6, 7; Pitek Depo. 11:6-8) Actors purchased a fidelity bond from CUMIS (the "Bond") for the annual period of January 1, 2010 to January 1, 2011. (Burger Decl. Ex. 4) On or about April 8, 2010, Actors submitted a Proof of Loss claim with CUMIS, and on or about June 10, 2010, CUMIS denied Actors' Claim. (Burger Decl. Ex. 17, 18) Actors initiated the instant action on March 29, 2011, alleging that CUMIS breached the terms of the Bond by failing to cover Actors claimed loss. (Dkt. #1) CUMIS disputes that Actors' loss falls within the terms of the Bond.

### A. Actors and Its Contracts With Mount Vernon Money Center and Armored Money Services

Actors operates ATMs at various locations throughout New York City. (Burger Decl. Ex. 1, ¶ 5) In December 2009, Actors entered into a contract (the "ATM Management Service Agreement") with MVMC for maintenance, cash settlement and replacement services related to Actors' ATMs. (Def. 56.1 ¶¶ 3, 4; Burger Decl. Ex. 6) Pursuant to the ATM Management Service Agreement, Actors would wire funds to MVMC's account at Signature Bank, which funds were then converted to physical currency and used by MVMC to replenish Actors' ATMs. (Burger Decl. Ex. 1, ¶¶ 20, 21; Ex. 6, ¶¶ 5, 6) This, at times, required MVMC to hold Actors' funds in one of its vault locations in order to perform tasks such as counting, creating "pre-packs" of the physical currency, or loading currency into cassettes to be delivered to ATMs. (Burger Decl. Ex. 1, ¶¶ 21, 22; Ex. 6, Ex. A thereto)

In December 2009, Actors also entered into a contract with Armored Money Services, LLC ("AMS"), a subsidiary of MVMC. (Burger Decl. Ex 7; Ex 14, p. 2; Ex. 15, ¶¶ h, i) AMS provided "money room services" for Actors. (Burger Decl. Ex. 7) Actors and CUMIS dispute the scope of these services. Actors originally asserted in its Complaint that MVMC used AMS to provide armored transportation services to accomplish ATM currency replenishment. (Cmplt. ¶¶ 25-26) However, Actors has since taken the position that AMS did not provide all of Actors armored transport services; instead, Actors only retained AMS to count and process currency from one of its members, Wall Street Finance, which is a money transmitter.[1] (Burger Decl. Ex. 1, ¶¶ 23, 24; Rodman Depo. 42:3-10) Relying on Actors' contract with AMS and on the allegations in the Complaint, CUMIS asserts that AMS was retained to transport funds between

---

[1] Money transmitters allegedly provide money wiring services, whereby they take physical currency from a customer in one location and then provide physical currency to the customer's intended recipient in another location. (Burger Decl. Ex. 1, ¶ 23; Rodman Depo. 43:18 – 44:6)

3

MVMC's vault and Actors' ATMs. (Def. 56.1 ¶ 6) Whether AMS provided all of Actors' armored transport services related to ATM replenishment remains a point of dispute.

### B. The MVMC Fraud

In January 2010, the Federal Bureau of Investigation ("FBI") began investigating reports of fraud by MVMC directed by two of its corporate officers, Robert Egan and Bernard McGarry. (Burger Decl. Ex. 15) On or about February 8, 2010, Mr. Egan was arrested and on February 11 and 12, 2010, the FBI seized MVMC's assets, including all funds held in its vaults. (*Id.*) Actors alleges that at the time of the FBI seizure, MVMC was holding, or was supposed to be holding, $3,984,840.00 of Actors' funds. (Cmplt. ¶¶ 68, 86-91) Shortly thereafter, Actors attempted to collect its funds from MVMC but was turned away by the FBI. (Rodman Depo. 70:17-23)

On March 10, 2010, a grand jury returned a seven-count indictment against Mr. Egan and Mr. McGarry, which included a count specifically charging Mr. Egan and Mr. McGarry with defrauding Actors. (Burger Decl. Ex. 12) On September 15, 2010, Mr. Egan pled guilty to all seven counts of the indictment and admitted, *inter alia*, that as far back as 2005 he misused funds belonging to Actors, sometimes using such funds for the needs of a different client or to cover MVMC operating expenses. (Burger Decl. Ex. 20, 19:4-22) On October 13, 2010, Mr. McGarry also pled guilty to all seven counts of the indictment and admitted, *inter alia*, that MVMC had been operating at a shortfall, meaning that it never had enough funds in its vaults to replenish all of its clients ATMs. (Burger Decl. Ex. 21, 19:1-17) Consequently, client funds were commingled and used to replenish ATMs without regard to which client's funds were used. (*Id.*)

As part of the criminal prosecutions, the federal government initiated forfeiture proceedings as to the approximately $19 million dollars seized from MVMC. (Burger Decl. Ex. 15) Numerous financial institutions filed petitions claiming portions of these funds as their own. (Moraites Decl. Ex. F, H) By court order dated January 17, 2012, Actors was found entitled to

4

$3,984,840 of the seized currency or, if the various court-approved petitions exceeded the value of the remaining seized currency, then Actors was entitled to its *pro rata* share of the seized currency. (Moraites Decl. Ex. F, p.10) By court order dated January 18, 2012, Actors was awarded its *pro rata* share of the remaining seized currency – $1,414,057.14. (Moraites Decl. Ex. H, p. 5)

### C. The Instant Dispute

On or about April 8, 2010, Actors submitted a Proof of Loss claim with CUMIS for all $3,984,840 dollars thought to have been seized by the FBI from MVMC's vaults, and on or about June 10, 2010, CUMIS denied Actors' claim. (Burger Decl. Ex. 17, 18) Actors initiated the instant action on March 29, 2011 asserting that its loss should be covered by the In Transit Provision of the Bond.[2] (Cmplt. ¶¶ 83, 84) This provision provides:

> We [CUMIS] will pay you [Actors] for your loss of 'covered property' resulting directly from 'theft,' mysterious unexplainable disappearance, misplacement, damage or destruction while physically (not electronically) *in transit* and within the custody of . . . An armored motor vehicle company utilizing an armored motor vehicle to transport 'covered property.' Transit begins immediately upon receipt of the 'covered property' by . . . such armored motor vehicle company, and ends immediately upon delivery at the destination."

(Burger Decl. Ex. 4) (emphasis added) CUMIS contends that Actors' loss is not covered by this provision for four reasons: (1) the loss did not occur while the funds were within the custody of "an armored motor vehicle company;" (2) the loss did not occur while an armored motor vehicle was being "utilized;" (3) the loss did not occur while the funds were "in transit;" and (4) the loss did not occur as the result of "theft." (Mot. 1) The Court now turns to each of these arguments.

---

[2] In its opposition papers, Actors asserts that CUMIS has taken "a contrary position" with respect to the loss claim filed by another CUMIS client – Delta Community Credit Union – and that it should be estopped from doing so. (Opp. 23-25) The Court need not reach this issue at this juncture because CUMIS' motion for summary judgment is denied, in its entirety, on other grounds.

5

III.  DISCUSSION

For the reasons that follow, the Court finds that questions of material fact remain regarding both the meaning of the In Transit Provision of the Bond and whether the requirements for coverage thereunder have been met.  Consequently, CUMIS' motion for summary judgment is DENIED in its entirety.

### A. There Is Evidence In The Record to Suggest That Mount Vernon Money Center Is An "Armored Motor Vehicle Company"

The Court first addresses CUMIS' argument that it is not obligated to cover Actors' loss because coverage under the Bond is limited to losses that occur while the funds are in the custody of an armored motor vehicle company, which MVMC is not. (Mot. 4) In support of its argument that MVMC is not an armored motor vehicle company, CUMIS points to Actors' contract with AMS and argues that it was AMS, not MVMC, that provided all armored transport services for Actors. (*Id.*) However, for the reasons stated below, there is a genuine dispute as to whether AMS provided armored transport services for Actors and, even if it did, whether MVMC also provided such services for monies transported between its vaults and Actors' ATMs.

CUMIS argues that MVMC is not a motor vehicle company because Actors "utilized another company procured under a separate contract, [AMS], to perform the armored motor vehicle services." (Mot. 4) This argument fails for three reasons.  First, looking at the language of the contract between Actors and AMS, the services that AMS is meant to provide to Actors are not clearly delimited. (Burger Decl. Ex. 7) Instead, the contract refers broadly to "money room services" and "armored services" without defining either term or in any way detailing the scope of these services. (*Id.*) Thus, the text of the contract alone does not answer the question of

6

whether or not AMS provided armored transport services for Actors, and it certainly does not clarify whether AMS did so to the exclusion of MVMC.

Second, the Court considers the extrinsic evidence cited by CUMIS for the proposition that AMS provided all of Actors' armored transport services – the deposition testimony of Jeffrey Rodman, President and CEO of Actors. (Mot. 5) Mr. Rodman testified that AMS was used for "armored car pickups of money from money transmitters." (Mot. 5) CUMIS fails to explain how, even if AMS provided armored transport services for monies coming from money transmitters, such a fact would preclude finding that MVMC provided armored transport services for monies that had to be moved as part of ATM replenishment. In other words, just because AMS provided some armored transport services for Actors does not necessarily mean that MVMC provided no such services. Indeed, in his affidavit in opposition to CUMIS' motion for summary judgment, Mr. Rodman clarified that Actors did not in fact contract with AMS for armored transport at all – instead, Actors contracted with AMS for the purpose of counting funds from Wall Street Finance, a money transmitter and member of the credit union, while Wall Street Finance was the entity who contracted with AMS regarding the transport of funds. (Burger Decl. Ex. 1, ¶¶ 23-24) In sum, the scope of the services provided to Actors by AMS is genuinely disputed.

Third, summary judgment is inappropriate given the evidence in the record identified by Actors, and left unaddressed by CUMIS in its summary judgment papers, which indicates that MVMC *did* provide armored transport of monies as part of its ATM replenishment services. For example, MVMC's transport of funds is expressly contemplated in the ATM Management Service Agreement between Actors and MVMC. (Burger Decl. Ex 6) Exhibit A to the contract describes the loading of currency into cassettes, which are then loaded into ATMs. (*Id.*) It also

describes the transport of empty or partially spent cassettes to MVMC's vault the same day as replenishment. (*Id.*) It can reasonably be inferred from this that MVMC transported cassettes containing Actors' funds between MVMC's vaults and Actors' ATMs.

Additionally, various documents in the criminal action against Mr. Egan indicate that MVMC provided armored transport of monies to and from its vault for clients using its ATM replenishment services. For example, in March 2010 the court-appointed receiver of MVMC filed a report with the court discussing, *inter alia*, the types of claims begin made against MVMC. (Burger Decl. Ex. 14) One set of claimants includes:

> Financial institutions [who] used the ATM Management business to service and replenish the cash in their ATM machines. These institutions wired their money to MVMC. Upon receipt of the wire, MVMC would dispatch an armored car to pick up the cash and return it to the MVMC vault. From there, the cash was dispensed to the various machines and the residual cash in the canister of the ATM was returned, counted and remained in the vault. MVMC would then notify the bank, via email, its balance. These institutions claim cash belonging to them resided in the vault.

Similarly, MVMC employee Jeffrey Cortes stated in an FBI interview that he was responsible for scheduling armored trucks to be used in ATM replenishment. (Burger Decl. Ex. 16) Based on this record, a reasonable jury could conclude that MVMC provided armored transport of monies between its clients' ATMs and MVMC's vaults as part of its ATM replenishment services.

In conclusion, summary judgment on this point is inappropriate because there is a genuine dispute as to whether or not MVMC provided Actors with armored transport services

### B. The Contract is Ambiguous As To Whether The Loss Must Occur While An Armored Vehicle Is Being "Utilized"

The Court turns next to CUMIS' argument that it is not obligated to cover Actors' loss because the Bond unambiguously limits coverage to losses that occur while an armored vehicle is being "utilized," *i.e.*, while the funds are *in* an armored motor vehicle, and Actors' loss

occurred while its funds were in an MVMC vault. (Mot. 3-4) The Court finds, however, that the language of the Bond is not sufficiently unambiguous on this point to warrant summary judgment.

An insurance contract is considered ambiguous where its terms are reasonably susceptible to more than one interpretation. *See Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010). By contrast, "[c]ontract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Ins. Co. of N. Am.*, 413 N.Y.S.2d 352, 355 (1978)).

The In Transit Provision provides coverage for losses that occur while the funds are "physically (not electronically) in transit and within the custody of . . . [a]n armored motor vehicle company *utilizing* an armored motor vehicle to transport [the funds.]" (emphasis added) CUMIS contends that the phrase "[a]n armored motor vehicle company utilizing an armored motor vehicle" unambiguously requires the funds to be in an armored motor vehicle at the time of loss. (Mot. 3-4) CUMIS further argues that because the funds were in an MVMC vault, rather than traveling in an armored vehicle at the time of loss, the loss is not covered by the Bond. (*Id.*)

The Court, however, disagrees that this phrase is unambiguous – "[a]n armored motor vehicle company utilizing an armored motor vehicle" could be read as describing the type of entity that must have custody of the funds at the time of loss and not as limiting coverage to the period of time when the funds are actually *inside* an armored vehicle. Moreover, as discussed *supra* pp. 7-8, a reasonable jury could, on the basis of the record currently before the Court,

9

conclude that MVMC is "[a]n armored motor vehicle company utilizing an armored motor vehicle." In light of both the contractual ambiguity and the evidence discussed above, summary judgment on this point is not warranted.

The Ninth Circuit's decision in *Palm Desert National Bank v. Federal Insurance Co.*, 300 Fed. Appx. 554 (9th Cir. 2008), heavily relied upon by CUMIS, does not require a different conclusion. (Mot. 4) In *Palm Desert*, the Ninth Circuit upheld a grant of summary judgment in favor of an insurer where the relevant insurance provision limited coverage to losses that occurred "while the Property is in transit anywhere in an armored vehicle, including loading and unloading thereof" but the stipulated facts demonstrated that the loss occurred while the property was in the carrier's office. 300 Fed. Appx. 554 at *1. Unlike the In Transit Provision, the insurance provision in *Palm Desert* unambiguously limited coverage to the period of time when the funds were either "in an armored vehicle" or being loaded or unloaded from the armored vehicle. 300 Fed. Appx. at 555. As already discussed, the same clarity of meaning simply is not present here.

### C. The Contract is Ambiguous As To The Meaning and Scope of "Transit"

By its own terms, the In Transit Provision provides coverage for losses that occur while the funds are "physically (not electronically) in transit . . . ." CUMIS' third argument for summary judgment is that "transit" does not include the period of time that Actors' funds were in MVMC vaults because this was not a stop merely incidental to delivery – it was a stop during which further work was performed (*e.g.*, counting, packaging, etc.), which, according to CUMIS, takes it outside the scope of the coverage provided by the In Transit Provision. (Mot. 5-6) However, the Court finds that neither the language of the Bond nor New York case law mandates this conclusion.

10

As with all contract interpretation, the Court looks first to the language of the Bond. Although "transit" is not defined in the definitions section of the Bond, the In Transit Provision explains that "[t]ransit begins immediately upon receipt of the 'covered property' by . . . such armored motor vehicle company, and ends immediately upon delivery at the destination." The relevant question then is whether or not an MVMC vault is a "destination" that terminates "transit." The language of the Bond does not unambiguously answer this question – indeed, neither party asserts that it does. Instead, CUMIS focuses its motion on case law. (Mot. 5-7)

However, the case law cited by CUMIS fails to establish that "transit" necessarily terminates once the funds are in an MVMC vault. CUMIS correctly states that in evaluating whether a stop has terminated "transit," New York courts consider "whether the goods, even though temporarily at rest, were still on their way, with the stoppage being merely incidental to the main purpose of delivery." *Irv-Bob Formal Wear, Inc. v. Public Serv. Mut. Ins. Co.*, 366 N.Y.S.2d 596, 599 (Queens Cnty. Civ. Ct. 1975). However, this rule fails to advance CUMIS' argument because it simply rephrases the underlying question that emerges from the language of the Bond: is a stop at MVMC's vaults merely incidental to delivery or are the vaults a "destination" such that the arrival of the funds to a vault terminates "transit?"

CUMIS asserts that this question is answered by applying the "further work" test – a stop is not merely incidental to delivery if "further work" is performed during the stop. CUMIS urges the Court to conclude that, because further work is performed on Actors' funds once they arrive at an MVMC vault, the stop at the vault is not incidental to delivery and "transit" is terminated. (Mot. 5-6) However, CUMIS fails to cite a single New York case in support of this "further work" test. Instead, CUMIS relies on the district court's decision in *Palm Desert*, which

11

applied California law, not New York law.[3] *See Palm Desert*, 473 F. Supp. 2d at 1049 (noting that New York cases "adopt a broad definition of 'in transit' provisions" and declining to adopt such an approach). Indeed, the district court explicitly stated that "[alt]hough there is only one reported case in California that addresses the meaning of the phrase 'in transit' that case provides the proper standard." *Id.* at 1049. It was based on this California case that the district court applied the "further work" test now urged on this Court by CUMIS. *Id.* at 1049-50. However, CUMIS having provided no basis for this Court to apply a test created by a California state court, the Court declines the invitation to do so.

In sum, neither the text of the In Transit Provision nor New York case law provides sufficient certainty for the Court to conclude that "transit," as used in the Bond, terminates when Actors' funds reach an MVMC vault. Consequently, summary judgment on this point is inappropriate.

### D. There Is Evidence In The Record to Suggest That Actors' Loss Was Caused by "Theft"

Finally, the Court turns to CUMIS' contention that summary judgment is warranted because Actors' loss was caused not by theft but by the FBI's seizure of all funds in MVMC's vaults. (Mot. 7-8) CUMIS essentially argues that Actors' loss could not have been directly caused by theft because all $3,984,840 of Actors' funds were present at MVMC when the FBI seizure occurred, thereby foreclosing coverage under the Bond. However, a reasonable jury could conclude that Actors' loss was in fact caused by the shortfall of funds in MVMC's vaults and that this shortfall was the result of a long-standing practice of commingling and embezzling client funds.

---

[3] On appeal, the Ninth Circuit agreed: "California insurance law governs the analysis." *Palm Desert*, 300 Fed. Appx. at 554.

The term "theft" is defined in the Bond as "the taking of property (a) without [Actors'] consent and with the intent to deprive [Actors] of the property or (b) by false pretenses and with the intent to deprive [Actors] of the property." CUMIS contends that even if MVMC commingled funds without Actors' consent, such commingling was not done with the intent to deprive Actors of its funds because Actors always received funds when necessary. (Reply 8) In other words, because Actors' ATMs were satisfactorily replenished until the time of the FBI seizure, there was no deprivation of property and no theft. The Court cannot accept CUMIS' argument – under such a rule, a Ponzi scheme would not involve theft as long as it remained undetected because there would always be one investor's money available to pay another investor.

Rather, as MVMC's principals admitted, beginning as early as 2005, client funds were not only commingled but also embezzled, meaning that MVMC never had enough funds in its vaults to cover all of its outstanding client obligations. (Burger Decl. Ex. 20, 19:4-22; Ex. 21, 19:1-17) Indeed, many of MVMC's clients who sought to recover funds following the FBI seizure were only able to secure a *pro rata* share of the seized funds because, as MVMC's principals indicated, the outstanding client obligations far exceeded the amount of cash that was actually in the vaults. (*See* Moraites Decl. Ex. H) Based on this evidence, a reasonable jury could conclude that Actors was deprived of its funds as the result of MVMC's ongoing practice of diverting and embezzling funds, which lead to a shortfall of available funds such that Actors could not recover the full amount of money it had entrusted to MVMC. For this reason, the Court rejects this argument as a basis for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that CUMIS' motion for summary judgment is DENIED in its entirety.

IT IS FURTHER ORDERED that trial counsel for all parties appear for a final pretrial conference before the Court on November 16, 2012 at 10:30 AM in Courtroom 17B of the United States Courthouse for the Southern District of New York, 500 Pearl Street, New York, New York.  Should either party wish to update or supplement their pre-trial materials in light of this Opinion, including the filing of any motions *in limine*, they must do so on or before October 17, 2012.

SO ORDERED.

Dated: September 17, 2012
       New York, New York

_____
ALISON J. NATHAN
United States District Judge